CHARLES P. CULP and ALICE R. CULP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Culp v. Commissioner
Docket No. 31902-86
United States Tax Court
T.C. Memo 1989-517; 1989 Tax Ct. Memo LEXIS 517; 58 T.C.M. (CCH) 207; T.C.M. (RIA) 89517; September 25, 1989
B. Ray Anderson and Thomas E. Crowe, for the petitioners. Thomas N. Thompson, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In timely statutory notices of deficiency or in his amended answer, respondent determined deficiencies in petitioners' Federal income tax liabilities for the years 1979, 1980, 1981, and 1982, and additions to tax, as follows: CHARLES P. CULP Additions to Tax, I.R.C. Secs. [1]
Year
Deficiency
6651(a)(1)
6653(a)
6654
1979
$ 27,465.24
$ 6,866.31
$ 1,373.26
$ 1,148.11
1980*
10,166.26 2,541.56 734.54
-
*519 CHARLES P. CULP AND ALICE R. CULP Additions to Tax, I.R.C. Secs.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(b)
1981
$ 513,748.30
-
-
$ 256,874.15
1982
1,896.00
$ 94.30
**
-
After settlement of some issues, the issues remaining for decision are: (1) Whether petitioner Charles P. Culp in 1980 or in 1981 received compensation for personal services and the amount thereof; (2) whether petitioners are liable for the fraud addition to tax determined for 1981; and (3) whether petitioner Charles P. Culp is liable for the fraud, delinquency, or negligence additions to tax determined for 1980. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time of filing their petition, petitioners resided in Drumright, Oklahoma. Unless otherwise indicated, all references to petitioner are to Charles P. Culp. Since 1969 petitioner has been employed as a stockbroker. In September of 1980, petitioner for the first time became involved in organizing, promoting, and taking public new high-risk companies. At that time, petitioner was introduced *520 to Louis Porter of Tulsa, Oklahoma, who with his son James Porter owned a private company named MAC Minerals, Inc. ("MAC Minerals"). MAC Minerals anticipated acquiring certain oil and gas properties located in Washita County, Oklahoma, which the Porters desired to transfer to a dormant publicly held company which they then would revive and the stock of which (after being received by the Porters and other participants in the transaction) would be aggressively marketed and promoted, producing substantial profits to holders of the stock. Inexplicably (even though Louis Porter did not acquire an interest in the oil and gas properties until February of 1981), on November 24, 1980, Louis Porter purportedly sold his "interest" in the oil and gas properties to MAC Minerals for $ 3 million, reflected by a promissory note MAC Minerals issued to Louis Porter in that amount due August 1, 1981. In the early fall of 1980, petitioner introduced Louis Porter to Carl Martin ("Martin") of Salt Lake City, Utah. Mr. Martin apparently was a business promoter and was particularly familiar with the process of promoting or reviving dormant companies. By agreement with petitioner and the Porters, Martin *521 undertook to locate a dormant or shell publicly held corporation. Martin discussed the transaction proposed by the Porters with the owners or representatives of Harmon Killebrew, Inc. ("Killebrew Inc."), a dormant Utah corporation. As the name indicates, the stock of Killebrew Inc. was owned primarily by Harmon Killebrew, the Hall of Fame baseball player for the Minnesota Twins. Others holding blocks of the dormant stock of Killebrew Inc. were Vibert L. Kesler, Mr. Killebrew's personal attorney, and Devere Watkins. As of the fall of 1980, the stock of Killebrew Inc. had not traded publicly for many years. Killebrew Inc. was not engaged in any business activity. It had no plans to do so, and there were reflected on its financial statements no significant assets or liabilities. On December 17, 1980, a stock purchase agreement was entered into through Martin on behalf of Louis Porter, as buyer, and Killebrew Inc., as seller, under which Louis Porter agreed to purchase 618,000 shares of common stock of Killebrew Inc. for a total cash price of $ 15,000 (approximately 2 1/2 cents a share). At that time, there were 813,532 shares of Killebrew Inc. common stock outstanding. On *522 December 22, 1980, pursuant to notice to shareholders, a meeting was held of the shareholders of Killebrew Inc. at which the shareholders approved the following actions: (1) The issuance of 3,254,158 additional shares of common stock; (2) the purchase of MAC Minerals' "interest" in the oil and gas properties referred to above in exchange for the issuance to MAC Minerals of the 3,254,158 additional shares of common stock to be issued; (3) the assumption by Killebrew Inc. of MAC Minerals $ 3 million "debt" to Louis Porter; and (4) the change of the name of Killebrew Inc. to MAC Energy, Inc. ("MAC Energy"). On January 22, 1981, the closing of the above transaction purportedly occurred by written agreement reflecting the transfer of the oil and gas properties to MAC Energy in exchange for the newly issued stock and the assumption of the $ 3 million debt. Under the agreement, all income from the oil and gas properties was to be used to pay off the $ 3 million "debt" to Louis Porter before it could be used for any other purpose. At the time of this transaction, the fair market value of the oil and gas properties was speculative and completely unknown to the shareholders and officers *523 of MAC Energy and apparently also to the other participants in the transaction. As of January of 1981, the properties were producing no income. On January 29, 1981, MAC Energy filed with the Securities and Exchange Commission a disclosure statement indicating that the corporation had 4,067,000 shares of common stock outstanding and 25,000,000 shares of common stock authorized. The filing of this statement was necessary before trading could begin in the stock of the reorganized company. On February 21, 1981, there were issued on behalf of petitioner 200,000 shares of the restricted common stock of MAC Energy. These shares were issued to petitioner primarily as a finder's fee in consideration for personal services petitioner rendered in bringing together the various participants to the transaction. The obligation or agreement of Killebrew Inc. or of MAC Energy to pay petitioner a finder's fee was not reflected in any written document. At petitioner's request, the 200,000 shares were issued not in petitioner's name, but in the name of his daughter, Linda Burroughs, as nominee for petitioner. The restricted nature of the stock was reflected by a legend on the front of the stock *524 certificate, which had the effect of preventing petitioner from publicly trading the shares for two years under Securities and Exchange Commission Rule 144. Not until March 31, 1981, pursuant to an agreement of February 9, 1981, were the oil and gas interests (that purportedly had been transferred to MAC Energy in December of 1980 or in January of 1981) actually transferred to Louis Porter from Excalibur Oil, Inc. ("Excalibur Oil"), an Oklahoma corporation, in exchange for Porter's 35 percent stock interest in Excalibur Oil and the cancellation of a debt Excalibur Oil owed Porter in the amount of $ 711,328. On the same day (namely, March 31, 1981), the oil and gas properties were transferred by Porter to MAC Minerals and by MAC Minerals to MAC Energy. In connection with the promotion of the stock of MAC Energy in 1981, the oil and gas properties were represented as having a value of $ 40 million. This figure appears to have been grossly inflated. It ignored the risks associated with the development of oil and gas properties, and it appears to have been fabricated solely to assist in the promotion and marketing of MAC Energy stock. Public, over-the-counter trading in the unrestricted *525 common stock of MAC Energy began in February of 1981 at 50 cents per share. From the limited evidence in the record, it appears that the publicly traded common stock of MAC Energy sold at various times from March of 1981 through September of 1981 at $ 3 per share to $ 14 per share. The price at which the shares were first bid by petitioner in February of 1981, in his capacity as the first market maker of the stock of MAC Energy, was 50 cents per share. On March 4, 1981 the bid price for MAC Energy common stock was $ 1.50 per share. On March 16, 1981, the bid price was $ 3 per share. Thereafter through the summer of 1981, the stock of MAC Energy was aggressively promoted by those individuals involved in the reorganization of the company. Many shares of MAC Energy common stock apparently were traded, but material facts concerning the trades are unclear, and the legitimacy and arm's-length nature of many of the trades are suspect. By the end of 1981 or early 1982, trading in the stock of MAC Energy had ceased, and the stock lost most if not all of its value. Much of the early trading in MAC Energy stock occurred in the over-the-counter penny stock market in Salt Lake City. Later *526 in the spring of 1981, trading of the stock expanded to over-the-counter markets in Oklahoma, Minnesota, and Wisconsin. In May of 1981, petitioner, again using his daughter Linda Burroughs as nominee, sold 10,000 shares of his restricted common stock in MAC Energy to Louis Porter or entities apparently controlled by Porter for $ 50,000 in cash (or $ 5 per share). Petitioner received the cash in May of 1981 but, at his request, the check in payment thereof was made out in favor of his wife, petitioner Alice R. Culp, who deposited the $ 50,000 into their joint bank account. In personal records of his stock purchases and sales, petitioner did not record this sale of 10,000 shares of MAC Energy stock. Petitioner still owns the remaining 190,000 shares of restricted common stock in MAC Energy that he received in February of 1981, and it has no value at this time. On June 15, 1981, the $ 3 million debt MAC Energy owed to MAC Minerals and the related $ 3 million debt MAC Minerals owed to Louis Porter were extinquished in exchange for the issuance to Louis Porter of 636,000 shares of the common stock of MAC Energy. This debt-for-stock exchange occurred in order to remove the $ 3 million *527 debt from MAC Energy's balance sheet which was necessary before the Allied Bank of Texas would approve a $ 10 million line of credit to MAC Energy. Uncertified financial statements for MAC Energy were prepared by Arthur Andersen & Company for MAC Energy's fiscal year ending August 31, 1981. Thereon, the oil and gas properties were reflected at a cost of only $ 1,352,156, and the non-arm's-length nature of the acquisition of the oil and gas properties was acknowledged. In early 1982, MAC Energy defaulted on the loan from the Allied Bank of Texas. Also in 1982, an investor in the common stock of MAC Energy was awarded a judgment against MAC Energy for fraud in connection with his purchase of common stock in the company in June of 1981 at $ 10 per share. In early 1981, petitioner voluntarily contacted respondent's offices in Oklahoma and informed respondent's representatives that he had not filed tax returns for 11 years (1969 through 1980), and petitioner requested a meeting with respondent's representatives in order to prepare and file the returns. Petitioner's requests for a meeting were declined a number of times by respondent's representatives until finally two representatives *528 of respondent's criminal investigations division appeared at petitioner's office. Petitioner was told by respondent's representatives not to file his delinquent tax returns until the criminal investigation was completed. Eventually petitioner was charged under section 7203 with three counts of failing to file tax returns for the year 1977, 1978, and 1979. He pled guilty to the charge for 1977, and the charges for 1978 and 1979 were dismissed. Petitioner filed his 1980 individual Federal income tax return on or about April 23, 1983, at the conclusion of respondent's criminal investigation. Thereon, petitioner reported total income of $ 32,558 as a stock broker. No income was reported thereon with respect to petitioner's receipt in connection with the transaction involving Killebrew Inc. and MAC Energy of 200,000 shares of MAC Energy restricted common stock. During the course of respondent's criminal investigation, petitioners' 1981 joint Federal income tax return was filed timely on April 15, 1982. Petitioners reported thereon $ 100,850 of income relating to petitioner's employment as a stock broker and to income petitioner earned as a market maker in the stock of MAC Energy. *529 However, no income was reported thereon with respect to petitioner's receipt of the 200,000 shares of MAC Energy restricted common stock, nor was the $ 50,000 or any portion thereof relating to petitioner's sale in May of 1981 of 10,000 shares of MAC Energy restricted common stock reported on petitioners' 1981 joint Federal income tax return. On audit, respondent determined that the 200,000 shares of restricted common stock of MAC Energy petitioner received in 1981 had a value at the time petitioner received the shares of $ 5 per share for a total value of $ 1 million. Respondent determined that this amount constituted additional income to petitioner that intentionally and willfully was omitted from petitioners' 1981 joint Federal income tax return. The fraud addition to tax under section 6653(b) was determined against both petitioners for 1981 in connection with the above $ 1 million alleged omitted income. Also on audit, respondent determined that petitioner's failure to timely file his individual Federal income tax return for 1980 was due to negligence under section 6653(a), and respondent determined against petitioner for 1980 the delinquent return addition to tax under section *530 6651(a)(1). In an amended answer respondent raised the alternative argument that if the value of the 200,000 shares of restricted common stock of MAC Energy was not taxable to petitioner in 1981, it was taxable to petitioner in 1980. Respondent also alternatively determined the fraud addition to tax against petitioner for 1980. At trial, respondent revised (to $ 3 per share for a total value of $ 600,000) his determination of the amount of income that should be charged to petitioner with respect to petitioner's receipt of the 200,000 shares of restricted MAC Energy common stock. Petitioner filed his 1980 individual income tax return, and petitioners filed their 1981 Federal income tax returns as cash basis taxpayers. OPINION Taxability of 200,000 shares of MAC Energy Restricted Common Stock
With respect to the receipt of property for the performance of services, section 83(a) provides generally that the value of property shall be included in the gross income of the taxpayer who performs the services and has the right to receive the property. The value of such property is included in income the first year the taxpayer has the right to transfer to third parties his *531 or her beneficial interest in the property or the first year the taxpayer's rights in the property are not subject to a substantial risk of forfeiture. However, under section 83(b), the taxpayer may elect to include the value of the property in gross income in the year of receipt of the property regardless of whether the taxpayer's rights therein at that time are transferable or subject to a substantial risk of forfeiture. Such election, however, must be made within 30 days of the initial transfer of the property to the taxpayer. Sec. 83(b)(2). For Federal income tax purposes, the valuation of property governed by section 83 is to be made without regard to temporary restrictions on the taxpayer's interest in the property. Sec. 83(a)(1). [2] Both parties herein acknowledge that section 83 governs the taxability to petitioners of the receipt of the 200,000 shares of MAC Energy restricted common stock. Petitioners, however, contend that under section 83 and Utah law petitioner should be regarded as having received the stock in December of 1980, not in 1981, and that the stock had a maximum fair market value at that time of 12 1/2 cents per share, or a maximum total fair market value *532 of $ 25,000. Respondent contends that petitioner received the 200,000 shares in February of 1981 and that the shares had a fair market value at that time of $ 3 per share, or a total fair market value of $ 600,000. *533 The respective contentions of the parties in this case and the wide disparity between these contentions are understandable. The inherent nature of the property petitioner received (namely, speculative, high-risk, over-the-counter stock in a company that was promoted largely on the basis of "hype" and on the basis of unsubstantiated claims concerning unappraised assets) and the penny-stock, non-arm's-length environment in which many of the transactions relating to the property occurred provide significant support for petitioner's low valuation of the property. The evidence, albeit limited, concerning the dramatic increase in the price at which the unrestricted common stock of MAC Energy traded during the months of March through September of 1981 provide support for respondent's much higher valuation of the property. Initially we must decide whether petitioner should be regarded as having received the property in December of 1980 or February of 1981. Petitioner argues that an oral agreement was entered into in the fall of 1980 between Louis Porter, Carl Martin, and himself to the effect that petitioner would receive $ 25,000 in cash for his services in bringing the participants *534 together to consummate the transaction. Petitioner argues that this agreement was modified in early December of 1980 to the effect that in lieu of $ 25,000 in cash, petitioner would receive 200,000 shares of stock in the reorganized company. Petitioner also argues that the limited services he rendered to bring the participants together were rendered in 1980, not in 1981, and that his rights to the shares should be regarded as having beneficially vested in him in 1980 under Utah law and under section 83. Petitioner's arguments concerning when he acquired rights to the 200,000 shares of restricted common stock of MAC Energy (or of its predecessor) are not persuasive. We find not credible petitioner's testimony offered on this issue. We conclude that petitioner was not entitled to any finder's fee or to the 200,000 shares of MAC Energy restricted common stock unless and until the transaction was consummated in writing. This was a purported multi-million dollar transaction but very little cash was at any time associated with it. It is inconceivable that Mr. Porter, Mr. Martin, or anyone else ever intended to pay petitioner anything unless and until the individuals and companies *535 petitioner brought together actually consummated the contemplated transaction in writing. This occurred early in 1981, and 1981 is the earliest year petitioner can be regarded as having earned or received the 200,000 shares of stock. We also note that (inconsistent with his claim that he received the stock in 1980) petitioner failed to include in his 1980 individual Federal income tax return any amount with respect to his receipt of the MAC Energy restricted common stock, and petitioner failed to make the election required under section 83(b) that might have been available to him to have the stock included in his 1980 income. We hold that petitioner received the 200,000 shares of stock in February of 1981 when he received the stock certificate, and the value of the 200,000 shares of stock is to taxable to petitioner at their value at that time. The amount of income that should be charged to petitioner in 1981 with respect to his receipt of the 200,000 shares of MAC Energy restricted common stock is less certain. A rule reflected in section 83 and a number of general principles of property and stock valuation and appraisal are particularly applicable to this determination. Section *536 83(a) provides that the valuation of property subject to section 83 is to be made without regard to temporary restrictions that affect the taxpayer's use of the property, as for example the two-year resale prohibition under Securities and Exchange Commission rules. Pledger v. Commissioner, 71 T.C. 618, 629 (1979), affd. 641 F.2d 287 (5th Cir. 1981). Sale prices of comparable property on dates other than the valuation date, even if proximate in time to the valuation date, are not controlling or particularly indicative of value where other factors explain the differences. See Crook v. Commissioner, 5 B.T.A. 197, 198 (1926), affd. 23 F.2d 1000 (5th Cir. 1928). Non-arm's-length sales of otherwise comparable property are not particularly indicative of value. Kinney's Estate v. Commissioner, 80 F.2d 568, 572 (9th Cir. 1935). Also relevant to the valuation or cost of property received is the value of property given in exchange or the value of services rendered. See Pittsburgh Terminal Corp. v. Commissioner, 60 T.C. 80, 87-88 (1973), affd. 500 F.2d 1400 (3d Cir. 1974). Particularly *537 applicable to the valuation question before us is a principle of valuation contained within the classic definition of fair market value. Therein, the fair market value of property is defined as the price at which property would be sold between a willing seller and a willing buyer, neither being under any compulsion to sell or buy and where both seller and buyer have reasonable knowledge of all relevant facts and circumstances. United States v. Cartwright, 411 U.S. 546, 551 (1973). Applying these and other accepted principles of valuation to the 200,000 shares of restricted common stock in MAC Energy that petitioner received in February of 1981, we conclude that the shares had a value of 50 cents per share. This is the price at which petitioner admitted he submitted bids for the stock on the over-the-counter market in February of 1981. It appears to reflect a price for the stock at a time before the speculators and market makers (from March through September of 1981) manipulated the price of the stock through transactions between themselves, through other non-arm's- length transactions, and even through fraudulent transactions. Certainly, if investors in the *538 stock had been properly and fully informed of manipulation in the price of the stock by the market makers such as petitioner and of the inflated and unsubstantiated nature of the claims being made by representatives of MAC Energy concerning the nature and value of the oil and gas properties, the price at which the stock would have sold from March through September of 1981 would have been significantly lower. We also note with respect to the value of the stock that petitioners' expert witness offered no credible testimony and that respondent offered no expert witness. Petitioner argues that in valuing the 200,000 shares of MAC Energy common stock a substantial blockage discount factor should be applied. On the evidence before us, particularly the large number of shares of MAC Energy common stock that traded in the months following February of 1981 at prices significantly higher than the per share price we adopt herein, we decline to apply any blockage discount to petitioner's shares of MAC Energy common stock. For the reasons explained, we conclude that the value of the MAC Energy stock petitioner received in February of 1981 was $ 100,000 (200,000 shares times 50 cents per share), *539 all of which is includable in petitioners' 1981 joint Federal taxable income as compensation for personal services. Properly allocating a pro rata share of petitioner's total cost basis of $ 100,000 in the MAC Energy common stock petitioner received [3] to the 10,000 shares of the stock petitioner sold for $ 50,000 in June of 1981, petitioner's short-term capital gain on this transaction is $ 45,000 ($ 50,000 in sales proceeds less cost basis of $ 5,000). This amount also constitutes taxable income to petitioners in 1981, should have been reported on petitioners' joint Federal income tax return for 1981, and is to be included in the computation of petitioners' 1981 Federal income tax liability. Fraud Addition to Tax For 1981
In order to establish fraud, respondent has the burden of establishing that the taxpayer intended to evade taxes which the taxpayer knew or believed were owed by conduct intended to conceal, to mislead, or otherwise to prevent the collection of the taxes. Zell v. Commissioner, 763 F.2d 1139, 1142-1146 (10th Cir. 1985), affg. a Memorandum *540 Opinion of this Court; Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Sec. 7454(a); Rule 142(b). Fraudulent intent will not be presumed or imputed, but it may be inferred from circumstantial evidence. Zell v. Commissioner, supra at 1143; Powell v. Granquist, supra at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner, 55 T.C. 85, 92-93 (1970). The mere failure to file tax returns is not sufficient to establish fraudulent intent under section 6653(b) where there is no evidence of falsification, concealment, or deception. Kotmair v. Commissioner, 86 T.C. 1253, 1260-1261 (1986). The fact, however, that a taxpayer failed to file tax returns for a number of years before the year in question and the fact that the taxpayer was convicted of failing to file tax returns in years proximate *541 to the year in question are certainly relevant to the determination of the taxpayer's liability for the fraud addition to tax. Fed. R. Evid. 404(b). Petitioner's long history of failing to file tax returns and his misdemeanor conviction under section 7203 for failing to file a tax return for 1977 are relevant and admissible in this case. The evidence before us establishes that petitioner willfully and intentionally filed a fraudulent Federal income tax return for 1981. Petitioner did not report the $ 100,000 fair market value of the MAC Energy stock on his and his wife's 1981 tax return, nor did petitioner report the stock at any other value in his 1981 taxable income. Petitioner also did not report the $ 50,000 in proceeds from the May 1981 sale of 10,000 shares of MAC Energy stock in the 1981 return. Both of these transaction were omitted from petitioner's personal records of his stock transactions, and both transactions were handled in a manner that indicates petitioner sought to conceal the transactions from the taxing authorities. Even though petitioner now claims that the value of the MAC Energy restricted common stock he received should *542 have been included on his 1980 tax return, when petitioner filed that return in 1983, he did not report any amount of compensation income relating thereto in the return. Petitioner's explanation for not reporting the value of the stock on his 1980 tax return (namely, that he did not understand the requirements of section 83), his explanation for not reporting the value of the stock on his 1981 tax return (namely, that he thought he received the stock in 1980), and petitioner's explanation for not reporting the substantial proceeds from the sale of 10,000 shares of MAC Energy restricted common stock on the 1981 tax return (namely, that he overlooked the transaction), are not credible. Petitioner argues that if he really intended to underpay his 1981 tax liability, he would have made sure his wife did not deposit into their joint banking account the $ 50,000 in cash received in 1981 from the sale of MAC Energy restricted common stock, and he would not have voluntarily disclosed to respondent's representatives his failure to file tax returns for earlier years (thereby inviting the tax audit that followed). Petitioner also argues that he would not have been so cooperative with respondent's *543 agents during the audit if he were attempting to conceal any of his income. In rejecting petitioner's explanations and arguments we reiterate that petitioner's failure to report the transactions in question on his and his wife's 1981 tax return as filed, the substantial amounts involved in the transactions, petitioner's failure to maintain adequate records with respect thereto, his efforts at concealing the transactions, combined with his long history of failing to file tax returns establish by clear and convincing evidence that petitioner is liable for the fraud addition to tax for 1981. The liability for the fraud addition to tax under section 6653(b) is not joint and several, and respondent must establish Mrs. Culp's liability therefor independently of petitioner's liability. Meier v. Commissioner, 91 T.C. 273, 303 n. 34 (1988); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971); Alberts v. Commissioner, T.C. Memo. 1986-483. Respondent has made no arguments as to Mrs. Culp's liability for this addition to tax, and we reject respondent's determination in this regard with respect to Mrs. Culp. Additions to Tax for 1980 *544 Respondent determined the fraud addition to tax against petitioner for 1980 only as an alternative to his fraud addition to tax determination for 1981. Having sustained the fraud addition to tax for 1981, respondent's alternative determination of the fraud addition to tax for 1980 is moot. On brief, respondent does not respond to the facts relied on by petitioner relating to the negligence and delinquency additions to tax for 1980. Petitioner made a voluntary disclosure to respondent in early 1981, before petitioner's 1980 Federal income tax return was due. Petitioner claims (and respondent does not dispute or disavow) that petitioner was told by respondent's representatives not to file his 1980 tax return until after respondent's criminal investigation was completed. The negligence and delinquency additions to tax determined for 1980 appear to be attributable solely to petitioner's late filing of the return. On the limited facts before us, we hold for petitioners on this issue. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * - Respondent asserted in his amended answer that if the income in question is determined to have been received in 1980 rather than 1981, the deficiency for 1980 should be increased by $ 695,363.74 to $ 705,530.00 with an addition to tax under section 6653(b).↩
**. - 50 percent of the interest payable on the entire amount of $ 1,896.00.↩
2. Sec. 83, in pertinent part, provides as follows: SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES. (a) General Rule. -- If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed,the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture. (b) Election To Include in Gross Income in Year of Transfer. -- (1) In general. -- Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of -- (A) the fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse), over (B) the amount (if any) paid for such property. If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture. (2) Election. -- An election under paragraph (1) with respect to any transfer of property shall be made in such manner as the Secretary prescribes and shall be made not later than 30 days after the date of such transfer. Such election may not be revoked except with the consent of the Secretary. (c) Special Rules. -- For purposes of this section -- (1) Substantial risk of forfeiture. -- The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by an individual. (2) Transferability of property. -- The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.↩
3. $ 100,000 divided by 200,000 shares equals a cost basis to petitioner of 50 cents per share.↩